UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| Shannon Brown,    )  | |
|     Plaintiff    ) | |
| ) | |
|          v.    ) | Case No.   09-1380 |
| ) | |
| Burlington Northern Santa Fe Railway    ) | |
| Company,    ) | |
|     Defendant    ) | |
| ) | |

**ORDER**

Now before the Court are the Defendant's motion (#47) to exclude the testimony of Plaintiff's expert witness David Fletcher, M.D. and motion (#52) to strike the fourth supplemental report of Dr. Fletcher. The motions are fully briefed, and I have carefully considered the parties' arguments and the evidence related thereto. As stated herein, the motion to exclude is GRANTED, and the motion to strike is GRANTED.

In addition, Defendant filed a motion (#63) for leave to file a reply brief to #47. Although the Local Rules of this Court do not allow reply briefs for this type of motion, it is within my discretion to allow a reply brief if interests of complete argument are served. I find that such interests are served in this case. Accordingly, the motion is ALLOWED. The Clerk is directed to file the reply brief attached to this motion, linking it to #47.

**I. INTRODUCTION**

The following facts are taken from the allegations of the complaint, as supported by the evidence submitted by the parties. Plaintiff Shannon Brown began his employment with Burlington Northern Santa Fe Railway Company ("BNSF") in 1996. In 2007, he was diagnosed by his family doctor, Dr. Grady, with carpal tunnel syndrome (CTS) in

both wrists and with cubital tunnel syndrome in his left elbow. Dr. Brady noted too that Brown's mother and possibly his grandmother had suffered from CTS.

On October 25, 2007, while Brown was working as a section foreman/track inspector, he alleges that he was ordered to lift very heavy angle bars. While doing so, he injured his right shoulder. He apparently did not immediately report this injury. His pain continued to increase. He reported the injury and went to the emergency room where x-rays revealed nothing. The next day he went to his family doctor, who ordered a shoulder arthrogram, which also showed normal results.[1] Brown continued to have pain, so Dr. Grady prescribed physical therapy. By Dec. 3, 2007, Brown reported to Dr. Grady that his pain was gone. He was released to return to work with no restrictions. Since Dec. 3, 2007, Brown has never complained about shoulder pain.

His release date, Dec. 3, 2007, was the day before he had his first wrist surgery for CTS on Dec. 4, 2007; surgery on his other wrist was performed on Jan. 22, 2008. He remained off work until March 24, when he returned to work with no medical restrictions. He alleges that in the subsequent years, BNSF required, on a daily basis, that he perform work requiring repetitive use of his hands and wrists under force and with vibratory equipment.

Finally, he alleges that in September of 2009, he was working in the Track Department. In that Department, he alleges that he was required to work excessive hours with improper equipment and to work "short-handed," which resulted in (or exacerbated) the cubital tunnel syndrome in his left elbow. On October 13, 2009, he had surgery on his elbow. He returned to work without restriction on Jan. 4, 2010.

---

[1] Because Brown has a pacemaker, no MRI could be conducted.

His surgeon for all three surgeries, Dr. Williams, deemed each surgery a success and noted that his symptoms were completely resolved. Brown remained employed at BNSF until Sept. 28, 2011. His work through that date was without medical restriction.

This history[2], he alleges, demonstrates three violations of BNSF's duty to provide him with a reasonably safe place to work, pursuant to the Federal Employers' Liability Act ("FELA"), 45 USC §51 et seq. He filed this lawsuit on Nov. 9, 2009.

## II. DR. FLETCHER'S TESTIMONY AND REPORTS

### A. INTRODUCTION

In support of his claims, Plaintiff retained David Fletcher, M.D., to conduct an independent medical exam (IME) and provide expert medical testimony. After conducting the IME on August 2, 2011, Dr. Fletcher issued[3] his first of four reports on October 11, 2011. Dr. Fletcher saw Brown again on Nov. 29, 2011 and issued a second report on Jan. 3, 2012. On July 19, 2011, Fletcher performed an on-site job site analysis (JSA) and issued a third report 7 months later, on Feb. 27, 2012.

Discovery in this case closed on Nov. 30, 2012. Defendant filed its motion for summary judgment and its motion to bar Dr. Fletcher's testimony on Jan. 7, 2013, the deadline for doing so. Two days later, Dr. Fletcher issued a fourth supplemental report, following his review of "supplemental material." Defendant has filed a motion to strike this final report. Defendant has also filed a motion to bar Dr. Fletcher's testimony.

### B. THE REPORTS

---

[2] BNSF interjects other information about Brown's work history, such as disciplinary actions and his ultimate discharge. As Plaintiff points out in his response, none of those matters is pertinent to the issue at hand. The Court has disregarded these impertinent assertions and any arguments based thereon.

[3] When the word "issued" is used in conjunction with Dr. Fletcher's reports, the date noted is the date of the cover letter accompanying service of the report on defense counsel, not the date of the report itself.

Dr. Fletcher first saw Brown on August 2, 2011, where he appeared for an independent medical examination (IME). The doctor issued his first report on October 11, 2011. (Def. Motion Exh. 5, BNSF-000118 et seq), reflecting his findings from that examination.

At the IME, Brown filled out a medical history questionnaire indicating, as is pertinent here, and needles in the palms of both hands that was minimal (easy to ignore). He reported that his right shoulder was "97% better." Brown "rated the pain he is experiencing now as '0'". Brown described the physical requirements of his job as lifting 100 pounds from the floor and 50 pounds overhead. He worked 12-6 hour days, lifting between 35-40 pounds, using hydraulic tools, vibratory tools, repairing track, shoveling, driving spikes, use of sledge hammers, and lifting heavy bars (40 pounds).

Dr. Fletcher conducted a physical examination with some testing. He examined the left elbow, noting hypothenar atrophy and loss of interosseous muscle strength in the left elbow (BNSF-000122). Testing showed a positive result for the Tinel's Test (left elbow) (BNSF-000122, and 000134), as well as a positive result of the elbow compression test (ulnar nerve at elbow [cubital tunnel]) (BNSF-000134).

As to the shoulder, the Doctor noted "impingement of the right shoulder", (BNSF-000122), a finding he later contradicted when he noted his examination of the shoulders, stating that "Impingement signs were negative bilaterally." (BNSF-000132). Dr. Fletcher also noted that Brown was unable to undergo an MRI because he had a pacemaker. This prevented a "formal diagnosis," leading to the doctor's statement that Brown needed a right shoulder arthroscopy "to bring his case to closure." (A previous arthroscopy, which

Dr. Fletcher referenced, had revealed no "full thickness rotator cuff tear.") (BNSF-000122)

No other abnormal test results were obtained, and no other abnormalities were noted in the physical examination, including the results for Brown's wrists.  At some point, Dr. Fletcher also reviewed Brown's past medical records. In addition to briefly summarizing those records, he noted the CTS surgeries, the elbow surgery and commented that "his right shoulder is a work injury when he was moving material weighing 45 lb and felt a pop in his shoulder." (BNSF-000121).[4]

In his first report (Exh. 5), Dr. Fletcher recited his findings and concluded that Brown:

> has developed cumulative trauma disorders from his job duties at the Burlington RR. It is my opinion to a reasonable degree medical [sic] certainty that his current condition is a direct result of his job activities at the Burlington Railroad.

(Exh. 5 at BNSF-000121).

An "updated report" from Dr. Fletcher was issued on January 3, 2012. BNSF Motion, Exh. 6). This followed Brown's return visit on Nov. 29, 2011, the purpose of which was "to discuss results of EDX testing which show axonal (nerve cell body) nerve damage in previously operated left ulnar nerve." (BNSF-000115). Brown reported a pain level of "3" (BNSF-000114) and described physical issues, which Dr. Fletcher described as follows:

> Today the patient complains of numbness in 3 fingers on his left hand. He is experiencing pins and needles on his left elbow. He reports sensitivity in nerve area. He states his hand goes numb when he leans on it. He reports exercising and stretching his left hand helps to decrease his pain.

---

[4] Plaintiff characterizes the comment about the right shoulder as being a statement that the injury was "traumatically caused by lifting heavy bars at work." This is not an accurate representation of the above quotation.

5

(BNSF-000113)

Dr. Fletcher stated that Brown was "still symptomatic in a classic left ulnar nerve distribution," concluding that Brown needed another left elbow surgery. As to the shoulder, he noted "positive right shoulder impingement with slight limitation of right shoulder", concluding that he "needs a right shoulder arthroscopy to bring his case to closure." The doctor mentioned that Brown want to have the testing "but hopes to land new job which is less physical." (BNSF-000115).

He stated that Brown "has incurred permanent loss. Permanent job restrictions are necessary. His prognosis is guarded; he is not MMI." (BNSF-000116). Dr. Fletcher also opined:

> Brown's work capacity is diminished. Again, it is my opinion that is related. Due to his persistent symptomatology, he needs permanent work restrictions assigned (avoid constant high force high frequency repetitive tasks and no vibration exposure). If begins to perform those former job tasks again his current condition will worsen and he will incur more permanency. He has not reached MMI and needs additional care."

(BNSF 000115).

Finally, the doctor concluded,

> He has developed cumulative trauma disorders from his job duties at the Burlington RR. It is my opinion to a reasonable degree of medical certainty that his current condition is a direct result of his job activities at the Burlington Railroad.

On February 27, 2012, Dr. Fletcher issued a third report. (Def's Motion, Exh. 7). This report reflected a job site analysis ("JSA") that he conducted on July 19, 2011. At the JSA, he took 52 photographs of Brown using various tools and material including the inspection truck that Brown routinely used in his position. The report contains numbered

6

statements correlating to the photographs, each providing a brief description of what the photo depicts[5].

Dr. Fletcher then summarized previous conclusions about Brown's physical condition. Again he repeated that Brown's pacemaker had prevented him from having an MRI, so there was no formal diagnosis of his shoulder. He stated that Brown's "work capacity is vastly diminished" and that he has "incurred significant permanent partial impairment loss." He again stated that job restrictions were necessary "as a result of the injuries he has sustained from cumulative trauma." (BNSF-002015).

The report concludes with a 31 paragraph section entitled "<u>OPINIONS</u>." (BNSF-0002016-2020). These paragraphs summarize Fletcher's qualifications and define "cumulative trauma disorder" (CTD).[6] Dr. Fletcher described his "methodological approach" as "differential etiology," which he defined as the process of identifying all potential causes of a patient's ailment and then systematically ruling out inapplicable causes, thereby arriving at what is the most likely cause of the ailment. *Id* at ¶11 and 20.

In an effort to apply this methodology to Brown's situation, Dr. Fletcher reviewed Brown's medical records and history, conducted several physical examinations, and employed a "job site analysis" ("JSA").

Dr. Fletcher defined a JSA as:

"going to the worksite with the patent and reviewing his or her job duties; measuring the frequency and force required for various job tasks; videotaping and photographing job task activities for further analysis; reviewing written job

---

[5] This report contains 54 numbered paragraphs that for the most part correlate to the 52 photographs. Paragraph 54, referred to further above, is a conclusion not associated with any particular photo. The court cannot tell whether there are actually 53 photos instead of 52 or whether there is duplication, but the fact that there is one paragraph too many in the report does not affect this Order.

[6] CTD "refers not to one specific injury but to numerous disorders caused by the performance of repetitive work over a long period of time. They are simply 'wear and tear' on the body, and they can be the product of many factors." ( BNSF-002017 ¶8) [citation to authority omitted].

>descriptions and determining if there are variances in the written job description as compared to the actual duties performed (in this case no such written job description was available;[sic]; using scientific measuring tools, such as a Chatillon gauge, which constitutes an objective measure of force; assessing push/pull job function factors; and evaluating the level of force exertion required to perform a job task."

*Id* at ¶19.

Despite the clear implication of ¶19 (above) that scientific equipment was used and scientific measurements were taken during the JSA, Dr. Fletcher later states in the report that "[i]f necessary, I can revisit the JSA and provide more objective quantitative detail using scientific measuring tools, such as a Chatillon gauge, which constitutes an objective measure of force; assessing push/pull job function factors; and evaluating the level of force exertion required to perform a job task." *Id* at ¶21. He also testified at his June 28, 2012 deposition that "ideally" he would have done actual testing to measure such things as vibration forces, and force for strain and push/pull, but that he "was not allowed to do that" by BNSF. (Def's motion, Exh. 8 at p. 29-30)[7]. In other words, the JSA consisted of Dr. Fletcher's observation and photography of Brown simulating the performance of his job tasks with his tools and equipment in the job environment; no scientific measuring tools were used and no actual scientific measurements were taken.

>Dr. Fletcher further commented about the JSA that it revealed:
>
>overhead work tasks; cramped areas underneath the rail cars, causing the worker to be forced to use a sledgehammer in an awkward positioning; the use of track jack to lift up rail, the use of various hand tools; the potential exposure to harsh outdoor environmental conditions, including extreme cold and extreme heat; and vibration exposure.

Exh. 7 at BNSF-002019 ¶22.

He then concluded with six opinions, as follows:

---

[7] Plaintiff did not file a motion bringing this to the Court's attention, either before or after the JSA.

1.  "It is my opinion, to a reasonable degree of medical certainty, that more likely than not Mr. Brown's job duties caused his right shoulder, bilateral carpal tunnel syndrome and left cubital tunnel conditions." *Id* at ¶26.

2. "It is my opinion, to a reasonable degree of medical certainty, that more likely than not Mr. Brown's job duties aggravated his underlying back condition and has made him symptomatic and requires additional work up." Id at ¶27.

3. "It is my opinion, to a reasonable degree of medical certainty, that the treatment he has received has been reasonable and necessary." *Id* at ¶28.

4. "It is my opinion, to a reasonable degree of medical certainty, that Mr. Brown has not reached maximal medical improvement and that he will require additional treatment to deal with his condition, including physical therapy and a second surgery on his left elbow and a right shoulder decompression." *Id* at ¶29.

5. "It is my opinion, to a reasonable degree of medical certainty, that due to his occupationally-related cumulative trauma disorders, Mr. Brown needs permanent work restrictions…In essence, Mr. Brown is not able to perform the job duties as a railroad track maintenance person…" *Id* at ¶30.

6.  "It is my opinion, to a reasonable degree of medical certainty, that Mr. Brown has incurred significant permanent partial impairment associated with pain and suffering." *Id* at ¶31.

Dr. Fletcher's deposition contained some crucial testimony about the bases of his opinions. First, he testified that he never actually observed Brown or any other BNSF employee perform "maintenance of way" duties (Exh. 8 at p.27); his first-hand experience with such duties was gained ten years earlier by observing for 40 minutes an employee of another railroad perform those duties. (*Id* at p 15-18). He does not know the frequency or duration of Brown's use of vibratory tools (*Id* at p.67) or the measure of force he used to hold or push his tools, (*Id* at p. 68), nor did he review any studies or articles to glean such information (*Id* at p.73-74). He did not feel it was necessary for him to have this information in order to render his opinions (*Id* at 65).

He also testified that Brown's job was not "repetitive" (*Id* at p.58), stating that it was necessary to take into account that "it's not like he's doing the same task over and over again for eight hours. It's a variety of job tasks." (*Id* at p.58). With respect to how many hours Brown worked, Dr. Fletcher relied solely on what Brown told him – that he worked 12-16 hour days. (*Id* at p.57-58, 63 70). In his deposition, however, Brown described his hours as "7:00 to 3:30" (Exh. 1 at p.24) and admitted he had no idea how many hours he worked from 2005 to 2007 (*Id* at 79-80) or whether he worked overtime in 2008 and 2009 and, if so, how many hours of overtime he worked (*Id* at 73-74).

On January 4, 2013, Dr. Fletcher issued a fourth supplemental report. The report states that he was asked to prepare it after reviewing "supplemental material since my discovery deposition on June 28, 2012." (Def's Motion to Strike, Exh.C, at (BNSF-002235) The additional material listed is: Defendant's Supplemental Rule 26(a)(1) disclosure; additional medical records from Dr. Williams; Defendant's expert's report; Caterpillar Employment and Medical Department Records; complete set of OSF records; fire department records, and deposition transcripts (4 BNSF employees, BNSF's medical director, Brown's wife, and Dr. Williams), as well as his own deposition transcript.

In the fourth report, Fletcher harshly criticized Defendant's expert, Lonn Hutchinson, Ph.D. (BNSF-002235-36*,* at ¶1-7). He also challenged the testimony of BNSF's corporate representative on CTS, Eric Weber. (*Id* at ¶13-15).

Dr. Fletcher declined to elaborate on the Caterpillar records, because he had already discussed them at his deposition. (BNSF-002236 at ¶8). He reviewed Brown's volunteer fire fighting records and stated that they did not change his previously stated opinions about causation. (*Id* at ¶9) He commented on Dr. Williams supplemental

10

deposition, noting that Dr. Williams had "changed his opinion on causation" when he learned that Brown smoked, had a MBI of 33.9, and had a family history of CTS. The remainder of Fletcher's comments about Williams' deposition testimony is nearly incomprehensible. (*Id* at ¶11). He declined to comment on the deposition of BNSF's medical director because it was about some other case, not Brown's case. (*Id* at ¶12).

### III. MOTION TO STRIKE DR. FLETCHER'S FOURTH REPORT (#52)

BNSF asks the Court to strike Dr. Fletcher's fourth report on two grounds: that it was untimely and that it is lacking factual support.

FRCP 26 requires retained experts such as Dr. Fletcher to provide a written report and to supplement information included in the report and information given during the expert's deposition. FRCP26(e)(2); See *David v Caterpillar, Inc*, 324 F3d 851, 856 (7th Cir 2003). Reports are to be produced "at the times and in the sequence directed by the court." *Salgado v General Motors Corp.* 150 F3d 735, 740 (7th Cir 1998); FRCP 26(a)(2)(D). Rule 26(e)(2) also requires that any "additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id* Rule 26(a)(3) in turn provides that, "[u]nless the court orders otherwise, these disclosures must be made "at least 30 days before trial."

In this case, the Court has ordered otherwise. The scheduling order that governs this case provides that all discovery was to have been completed by Nov. 30, 2012. "All discovery" includes all requisite supplementation. If it did not, the deadline would be toothless. The fourth report was untimely.

Moreover, there is no cognizable explanation for the failure to present this report earlier. All of the "supplemental material" that Dr. Fletcher reviewed for his fourth report

11

was material that was available to him well before the discovery deadline. See, *Salgado*, 150 F3d at 738 (excluding supplemental report based on information available prior to court-ordered discovery deadline).

Finally, the opinions in this report are for the most part not simply "supplementation" of Dr. Fletcher's prior opinions; they are new opinions altogether. The purpose of Rule 26(e)(2) is to allow supplementation or correction, not to extend the deadlines for expert disclosure and report production. See, *Allgood v General Motors Corp.*, 2007 WL 647496 (SD Ind); *Metro Ford Truck Sales Inc. v Ford Motor Co.*, 145 F3d 320, 324 (5th Cir 1998).

The fourth report of Dr. Fletcher was untimely because it was served on the Defendant after the close of all discovery. Because of that finding, it is completely unnecessary to address arguments regarding the substance of the report. The motion to strike the fourth report is GRANTED, and the opinions contained therein may not be used in opposition to summary judgment or at trial.

## IV. MOTION TO EXCLUDE DR. FLETCHER'S TESTIMONY (#47)

A. *Daubert* and its progeny

Admissibility of expert testimony is governed by FRE 702 and 703. Expert opinion testimony is admissible if the expert is qualified and:

> a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b. the testimony is based on sufficient facts or data;
> c. the testimony is the produce of reliable principles and methods; and
> d. the expert has reliably applied the principles and methods to the facts of the case.

FRE 702.

An expert's opinion is to be based on "facts or data in the case that the expert has been made aware of or personally observed." FRE 703. If the facts or data are of a type that experts in the particular filed reasonably rely on, the facts underlying the opinion need not themselves be admissible. *Id*

The requirements of these two Rules have been boiled down into a three-part analysis: the expert must be qualified (which is not disputed in this case); the methodology employed must be reliable; and there must be a relevant connection between the methodology and the opinion (this is not disputed by the Defendant). *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993); *Messner v Northshore University Health System*, 669 F3d 802, 811 -812 (7th Cir 2012); *Myers v Illinois Central Railroad Co.*, 629 F 3d 639, 644 (7th Cir 2010).

The court acts as a "gatekeeper", *Kumho Tire Co. v Carmichael*, 526 US 137, 147 (1999), and must provide more than conclusory statements to show that it properly performed its gatekeeping function. *Id* The analysis is not intended to supplant the adversarial process, and so even "shaky" testimony may be admissible. *Gayton v McCoy,* 593 F3d 610, 616 (7th Cir 2010); see also, *Ortiz v City of Chicago,* 656 F3d 523, 536 (7th Cir 2011), citing *Daubert*, 509 US at 596.

The district court has significant latitude in determining how to measure the reliability of the proposed expert and in determining whether the testimony is in fact reliable. *Gayton* at 616. The court's role as gatekeeper is strictly limited to an examination of the expert's methodology. *Smith v Ford Motor Co.*, 215 F3d 713, 718 (2000). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be

determined by the trier of fact." *Id* (citing *Daubert,* 507 US at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.")); *Griffin v Foley*, 2006 WL 5201345 (SD Ind)One basic premise of reliability is that the opinions must not be based on speculation or subjective belief. *Chapman v Maytag Corp.*, 297 F3d 682, 687 (7th Cir 2002). This is, of course, consistent with Rule 703, which requires that expert opinions be based on "fact." Opinions that are speculative or subjective must be rejected.

The proponent of an expert – here, the Plaintiff - bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. *Lewis v CITGO Petroleum Corp.*, 561 F3d 698 (7th Cir 2009), citing *Bourjally v US*, 483 US 171, 175-76 (1987).[8]

In *Meyers*, the Court considered a plaintiff's claim that his injuries – including cumulative trauma disorders – were caused by the railroad's negligence. The plaintiff proffered four expert witnesses – an ergonomist and three physicians. The District Court reasoned that the experts' understanding of the plaintiff's medical history and work duties were inadequate to support causation injuries. Specifically as to the ergonomist, the District Court found that his analysis of railroad conditions was not focused on the plaintiffs' actual work, so his opinion was not reliable. The District Court barred all the

---

[8] *Bourjally* dealt with admissibility of evidence before a jury in a criminal case. *Lewis* applied *Bourjally* to the summary judgment stage in a civil case without any discussion. Nonetheless, after *Lewis*, courts in this Circuit place the burden on the party proffering the expert, rather than on the party moving to exclude the expert and/or his testimony See, e.g., *Estate of Carlock v Williamson*, 2012 WL 5386136 at *5 (CD IL) (D.J.Myerscough); accord, *Goldberg v 401 North Wabash Venture LLC*, 2013 WL 212912 at *1 (ND IL); *Cunningham Charter Corp. v Learjet Inc.*, 2012 WL 1565535 at *3 (SD IL).

14

experts, finding that none of their opinions was based on reliable procedures or methods, and then granted summary judgment for the Railroad.

On appeal, the Seventh Circuit affirmed the lower court, first finding that injuries such as cumulative trauma disorders require expert testimony causally linking them to the work place. The Court noted CTD's are not generally caused by one specific traumatic event, instead being the result of "wear and tear" on tissue surrounding joints, ligaments and tendons. Certain risk factors are associated with CTD's, such as repetition, force, vibration, cold and posture. *Id* at 642. Hence, expert testimony linking the disorder to those risk factors is required, and an ergonomist – who might well understand work conditions but is not a medical doctor – would be qualified to testify about specific dangerous conditions, but he would not necessarily be qualified to testify about causation. "The question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Id* at 644. The ergonomist in *Myers* was not qualified to testify about causation.

Next the Court of Appeals reviewed the District Court's barring of the medical doctors' causation testimony. The lower court had found that the physicians' lack of knowledge about plaintiff's medical history and work duties rendered their opinions unreliable under *Daubert*. On appeal, the plaintiff argued that the "differential diagnosis" used by these experts was sufficient to support a causation opinion and that ignorance of medical history and job duties should have been explored on cross examination.

Differential diagnosis, said the Seventh Circuit, is a valid methodology to determine which of several possible diseases is the one the patient has; it is not, however, the pertinent methodology for describing what caused the ailment. That is differential

15

etiology, which is the study of causation. *Id* The Court's definition of "differential etiology" is nearly identical to Dr. Fletcher's definition: "the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Id* The methodology itself is not controversial at all, but the question whether it is reliable in any given case depends on which potential causes should be ruled in and which should be ruled out, a process that is case specific. *Id* Because the medical experts had neither ruled in nor ruled out any causes, simply opining that working conditions caused plaintiff's injuries, their testimony was properly barred. Said the Court, "Given the nature of [plaintiff's] injury and his work, it seems natural to offer such an opinion. But the law demands more than a casual diagnosis that a doctor may offer a friend or acquaintance outside the office about what could be causing his aches and pains." *Id*

The Court went on to note that an expert need not be stricken simply because he was "unaware of aspects of this work or medical history, nor because the plaintiff had mis-reported his history; such inaccuracies or deficiencies are to be explored through cross examination. But where the expert knows "little or nothing" about medical history or work, then the expert cannot claim to be using differential etiology. In such cases, the expert's opinion on causation "is properly characterized as a hunch or an informed guess." *Id* at 645.

B. DISCUSSION

In this case, the issue is reliability: Did Dr. Fletcher reach his opinions by reliably employing his stated methodology, namely differential etiology? Defendant asserts (1) that his opinions on the cause of Brown's CTS and cubital tunnel are not supported by a

16

reliable, scientifically accepted methodology; (2) that Dr. Fletcher's opinion on the cause of Plaintiff's shoulder injury is not supported by a reliable scientifically accepted methodology; and (3) Dr. Fletcher's opinion that Brown suffered cumulative trauma is inconsistent with Brown's pleadings and deposition testimony that he suffered a specific injury.

Dr. Fletcher's causation opinion is not a medical opinion; it is an ergonomic[9] opinion. *Myers* and other cases cited by BNSF make it clear that such opinions must be based on scientific, technical and other specialized knowledge of the particular job. There are, as Dr. Fletcher's own definitions illustrate, scientifically accepted methods and procedures for evaluating the link between occupational risks and CTDs.

He defined CTD's (Exh. 5) as not being one specific injury but rather consisting of "numerous disorders caused by the performance of repetitive work over a long period of time. They are simply 'wear and tear' on the body, and they can be the product of many factors." Despite his own definition, he admitted that he did not know anything about the repetitive nature of Brown's work and in fact appears to have conceded that the work was not repetitive. He stated that he employed a JSA to help him understand Brown's work, but his own definition of JSA requires "using scientific measuring tools, such as a Chatillon gauge, which constitutes an objective measure of force; assessing push/pull job function factors; and evaluating the level of force exertion required to perform a job task." He conducted none of those measurements.

---

[9] Ergonomics is defined as the "science relating to man and his work, embodying the anatomic, physiologic, psychologic, and mechanical principles affecting the efficient use of human energy." *Stasior v National Railroad Passenger Corp.*, 19 FSupp2d 835, 847 (NDIL 1998), citing *Dorland's Illustrated Medical Dictionary* at 574 (W.B. Saunders Co., 28 ed. 1994).

Application of differential etiology by definition involves "ruling in" all potential causes of the disorder. Brown's physical history revealed that his mother and possibly his grandmother suffered from CTD. Dr. Fletcher agreed that there is a genetic predisposition to CTD, yet the doctor failed to "rule in" Brown's history. He agreed that obesity and CTD are correlated, yet without any scientific analysis he simply dismissed this possibility. He did not consider the fact that Brown rode a motorcycle, despite his admission that riders have a higher incidence of CTD. He did not know that Brown smoked, although smoking is an independent risk factor for developing CTD. The doctor knew that Brown was a volunteer firefighter but did not inquire into the duties or tools involved or into the frequency of Brown's activities in this regard.

Case law uniformly rejects expert causation opinions about CTD's that are based on nothing more than a recitation of risk factors, unsupported by studies about magnitude, duration and frequency of those risk factors in the specific job. See, *Stasior*, 19 FSupp2d at 848-49 (citing cases), and that are not based on a complete evaluation of the presence of those risk factors in non-work portions of the patient's life.

Dr. Fletcher's failure to apply the very methodology he embraced in his first report dooms his opinions about CTD's, because by his own definitions, he did not have enough information to draw the conclusion that Brown's CTD's were caused by his work activities. His review of the medical records and of the results of his examinations and testing of Brown may suffice to render an opinion as to the *diagnosis* of CTD, but the information gleaned regarding Browns' medical conditions do not suffice to render an opinion on *causation*. The lack of scientific methodology linking the diagnosis to Brown's work duties and "ruling out" other possible causes of the CTD means that Dr.

Fletcher's causation opinion is not based on scientific, technical and other specialized knowledge. As a result, Dr. Fletcher's causation opinion as to the CTD's is subjective and speculative and must be barred.

Dr. Fletcher also opined on Brown's shoulder injury, stating that it was caused by his work at BNSF. This opinion is, according to BNSF, unreliable because no one, not even Dr. Fletcher, knows what is wrong with Brown's shoulder and because the doctor does not know enough about Brown's work to determine if it caused the injury.

The record in this case shows that Brown reported pain in his shoulder beginning on October 25, 2007. His personal doctor conducted two tests – an x-ray and an arthrogram, neither of which revealed any abnormality. That doctor ordered physical therapy in order to relieve the pain. Dr. Fletcher acknowledged that "a formal diagnosis has not been made" other than the observation that the tests did not reveal "a full thickness of rotator cuff." Dr. Fletcher himself stated that Brown "needs a right shoulder arthroscopy to bring his case to closure," but no such arthroscopy was performed before Dr. Fletcher opined on causation.

Dr. Fletcher's causation opinion states that Brown injured his shoulder using an "iron angle tool." The doctor referred in his deposition to photographs of Brown using that tool, describing the motion being used as an overhand, pushing down motion. Unfortunately the two photographs he identified were of a track jack, not an iron angle tool, which is not, despite its name, actually a tool – it is a piece of steel bolted to the track. Brown himself testified that when he hurt his shoulder, he was throwing broken angle bars off of his inspection truck, which would appear to involve the opposite of an overhand, pushing down motion.

Dr. Fletcher's review of medical records and his physical examination of Brown did not result in a specific diagnosis of the shoulder problem. Dr. Fletcher does not know if Brown's pain is the result of a specific injury, CTD, arthritis, or a bone spur. He was not able to rule any of those possibilities out.

To opine on causation under those circumstances is to speculate. Speculative opinions are not admissible.

## V. CONCLUSION

As stated herein, both motions are GRANTED. Dr. Fletcher may not render a causation opinion as to either the CTDs or the shoulder injury. The fourth report is barred, and any new opinions or corrections to earlier-stated opinions contained therein are barred.

ENTERED: April 22, 2013

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE